## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| PEDRO CASTRO and AMALIA CASTRO, a married couple,<br><br>**Plaintiffs,**<br><br>v.<br><br>SGT. JEFF S. ROBINSON, a Deputy of the Utah County Sheriff's Office,<br><br>**Defendant.** | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:22-cv-00464-JCB<br><br><br><br>Magistrate Judge Jared C. Bennett |

STATEMENT OF FACTS[1]

On August 11, 2021, Plaintiffs Pedro Castro ("Mr. Castro") and Amalia Castro (collectively, "Castros") were driving north through Utah County on Interstate 15[2] when they caught the attention of Utah County Sheriff's Deputy Roger Lowe ("Deputy Lowe").[3] Deputy Lowe contacted Utah County Sheriff's Sergeant Jeff Robinson ("Sgt. Robinson") and reported that the occupants of a vehicle with out-of-state license plates—later identified as the Castros—appeared to be "nervous."[4] Deputy Lowe arrived at this conclusion because the Castros "were driving roughly the speed limit and then abruptly slowed down and changed lanes to get further

---

[1] Under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have consented to Judge Jared C. Bennett conducting all proceedings in this case, including entry of final judgment. ECF No. 76.

[2] ECF No. 108 at 2; ECF No. 109 at 2.

[3] ECF No. 108 at 2; ECF No. 109 at 2.

[4] ECF No. 108 at 2; *see also* ECF No. 109 at 2.

away from" Deputy Lowe.[5] So, Deputy Lowe followed them.[6] Deputy Lowe reported to Sgt. Robinson that the Castros quickly pulled off Interstate 15 in Payson, Utah[7] and continued to drive through a neighborhood that local law enforcement believes is a "high-crime area," especially for narcotics.[8] But the Castros neither stopped nor remained in this neighborhood, which Deputy Lowe also reported to Sgt. Robinson as "suspicious."[9]

Deputy Lowe further informed Sgt. Robinson that the Castros visited a Taco Time eatery in Payson but did not order anything.[10] Instead, Deputy Lowe reported that the Castros sat at a table and stared out the window.[11] Mr. Castro testified that he was talking to his brother-in-law at the Taco Time and was looking out the window because he was "scared."[12]

Because Deputy Lowe had a meeting, he asked Sgt. Robinson to come to Taco Time to observe the Castros.[13] Sgt. Robinson arrived at Taco Time in an undercover gray Chevrolet Tahoe that had no law enforcement markings.[14] Deputy Lowe departed after giving Sgt. Robinson a description of the Castros and their vehicle.[15]

---

[5] ECF No. 109 at 2.

[6] ECF No. 108 at 2; ECF No. 109 at 2.

[7] ECF No. 108 at 2.

[8] ECF No. 108 at 2; ECF No. 109 at 2.

[9] ECF No. 108 at 2; *see also* ECF No. 109 at 2.

[10] ECF No. 108 at 3; ECF No. 109 at 2.

[11] ECF No. 108 at 3; ECF No. 109 at 2.

[12] ECF No. 112-2 at 32-33 of 38.

[13] ECF No. 108 at 3; ECF No. 109 at 2.

[14] ECF No. 108 at 3.

[15] ECF No. 109 at 2.

About ten minutes after Sgt. Robinson arrived, the Castros exited Taco Time, entered their vehicle, and drove eastbound on Highway 198.[16] While driving, Sgt. Robinson states he saw the Castros' vehicle "swerve within their lane" before he activated his dash camera.[17] Several seconds after activating the dash camera, the Castros quickly changed lanes from the eastbound lane of travel into a left-turn lane.[18] The Castros' vehicle crossed the solid white line, as shown in the diagram below, but quickly fit their entire vehicle within the turn lane. In the diagram, the Castros' vehicle is designated as π, Sgt. Robinson's vehicle is designated as Δ, and an uninvolved vehicle between the Castros and Sgt. Robinson is designated as B.



The dash camera footage does not show whether or for how long the Castros used their left signal light before making this lane change. Although Sgt. Robinson states that the Castros did not signal for a full two seconds before changing lanes,[19] Mr. Castro contends he appropriately signaled.[20] However, once the dash camera was within range to perceive the Castros' taillights,

---

[16] ECF No. 108 at 3-4.

[17] *Id.* at 4.

[18] *Id.*

[19] *Id.*

[20] ECF No. 112-2 at 13 of 38.

the dash camera footage shows that the Castros' left-turn signal light was on when they were in the left-turn lane. The footage also shows that vehicle B never touched its brakes when the Castros changed lanes, suggesting that vehicle B was far behind the Castros' vehicle.

Sgt. Robinson states that he turned on his lights and stopped the Castros based on four alleged indicia of impaired driving: the Castros' (1) "[s]werving within the lane" that was not recorded on the dash camera; (2) abrupt decision to turn left; (3) crossing a solid white line to enter the left-turn lane; and (4) not signaling for a full two seconds before making the lane change, which is not observable from the dash camera footage.[21] Because the only issue remaining in this action is whether Sgt. Robinson violated the Fourth Amendment of the United States Constitution by stopping the Castros,[22] the court omits facts regarding the remainder of the stop but points out that Sgt. Robinson cited Mr. Castro for failure to signal properly.[23] Prosecutors declined to pursue that citation in court.[24]

## PROCEDURAL BACKGROUND

The Castros originally filed this action in the Utah Fourth Judicial District Court in Utah County.[25] But the originally named defendants, including Sgt. Robinson, removed the action to

---

[21] ECF No. 108 at 4.

[22] ECF No. 72.

[23] ECF No. 108 at 6. Although Sgt. Robinson acknowledges that the Castros never pled that the stop was unconstitutionally prolonged, he argues the point anyway. ECF No. 107 at 20. And although the Castros also admit that they never pled this cause of action, they too argue it anyway. ECF No. 112 at 21 (stating that a claim for a prolonged stop "was not alleged"). Because the length of the stop is clearly not an issue, the court does not address it.

[24] ECF No. 41, ¶ 92; ECF No. 73, ¶ 92.

[25] ECF No. 2-1.

this court.[26] Thereafter, the originally named defendants moved for judgment on the pleadings.[27] The court granted their motion[28] and allowed the Castros to amend their complaint.[29] The Castros' amended complaint brought claims under: (1) 42 U.S.C. § 1983 based on the Fourth and Fourteenth Amendments; (2) Utah Constitution Article I, §§ 7, 14; and (3) 42 U.S.C. § 1985.[30] The originally named defendants then moved to dismiss,[31] which the court granted as to all parties and claims except the Castros' Fourth Amendment and Article I, § 14 claims against Sgt. Robinson relating to the stop of their vehicle.[32]

After the close of discovery, Sgt. Robinson moved for summary judgment based on qualified immunity.[33] Because the court finds that there are disputed issues of material fact, the court denies Sgt. Robinson's motion for summary judgment as to the Castros' § 1983 claim and sets the matter for trial. But because the Castros' injuries may be redressed through § 1983, the court grants Sgt. Robinson's motion for summary judgment as to the Castros' claim under Article I, § 14 of the Utah Constitution.

## LEGAL STANDARDS

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[26] ECF No. 2.

[27] ECF No. 15.

[28] ECF No. 35.

[29] ECF No. 40.

[30] ECF No. 41.

[31] ECF No. 49.

[32] ECF No. 72 at 25-26.

[33] ECF No. 107.

judgment as a matter of law." "A genuine issue of fact exists only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[34] "Thus, the relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[35]

In evaluating a motion for summary judgment, the court "view[s] the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."[36] "'The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.'"[37] If the movant does not bear the burden of proof at trial as to the claims for which it seeks summary judgment, then the movant "may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."[38]

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."[39] To satisfy its burden, "the nonmovant must identify facts 'by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.'"[40] "These facts must establish, at a minimum, an

---

[34] *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[35] *Id.* (quoting *Anderson*, 477 U.S. at 251-52).

[36] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[37] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)).

[38] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[39] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citation modified).

[40] *Savant Homes, Inc.*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

inference of the presence of each element essential to the case."[41] Summary judgment is required,

> after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.[42]

### ANALYSIS

**I.   The Court Cannot Grant Sgt. Robinson's Motion for Summary Judgment Based on Qualified Immunity Because of Disputed Issues of Material Fact.**

Disputed issues of material fact preclude the court from granting Sgt. Robinson's motion for summary judgment based on qualified immunity. "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law."[43] "Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: ([A]) that the defendant's actions violated a federal constitutional or statutory right, and, if so, ([B]) that the right was clearly established at the time of the defendant's unlawful conduct."[44] Each prong of qualified immunity is addressed in order below.

---

[41] *Id.* at 1137-38 (citation modified).

[42] *Celotex Corp.*, 477 U.S. at 322-23 (citation modified).

[43] *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (citation modified).

[44] *Id.* at 900 (citation modified).

A. <u>Disputed Facts Exist Regarding Whether Sgt. Robinson Violated the Fourth Amendment of the United States Constitution by Stopping the Castros.</u>

Disputed issues of material fact preclude qualified immunity on summary judgment as to the Castros' Fourth Amendment claim. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[45] A traffic stop is a "seizure" under the Fourth Amendment.[46] "[T]he ultimate touchstone" for the constitutionality of a search or seizure under the Fourth Amendment is "reasonableness."[47] The reasonableness of a search or seizure depends upon whether, when viewed objectively, the challenged action was justified under the circumstances.[48]

"In analyzing the constitutionality of a traffic stop under the Fourth Amendment, [the court applies] the 'reasonable suspicion' standard for investigative detentions originally set forth in *Terry v. Ohio*."[49] "To justify a *Terry* stop[,] the detaining officer must have, based on all the circumstances, a 'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'"[50] The court begins this inquiry by determining "whether an officer's stop of a vehicle was justified at its inception."[51] "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable

---

[45] U.S. Const. amend. IV.

[46] *United States v. Worthon*, 520 F.3d 1173, 1179 (10th Cir. 2008).

[47] *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citation modified).

[48] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735-36 (2011).

[49] *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

[50] *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

[51] *Id.* (citation modified).

suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."[52] "For reasonable suspicion to exist, an officer need not rule out the possibility of innocent conduct; he or she simply must possess some minimal level of objective justification for making the stop."[53] The court does not address probable cause at summary judgment because it concludes that Sgt. Robinson cannot establish reasonable suspicion for stopping the Castros.

Sgt. Robinson's motion for summary judgment contends that he had reasonable suspicion—if not probable cause—to stop the Castros based on six possible traffic violations. Specifically, Sgt. Robinson contends that Mr. Castro: (1) did not signal for the requisite two seconds prior to changing lanes into the left-turn lane;[54] (2) did not signal before slowing down to change lanes;[55] (3) did not stay in one lane when he quickly crossed a solid white line into the left-turn lane;[56] (4) failed to reasonably determine if he could safely change lanes;[57] (5) committed a moving violation by being distracted by his wife's directions inside the vehicle;[58] and (6) committed two or more traffic violations within three miles of continuous driving.[59] Reasons (1) and (2) are discussed separately while reasons (3) and (4) and then (5) and (6) are discussed in pairs below.

---

[52] *Id.* at 1134.

[53] *Id.* (citation modified).

[54] Utah Code Ann. § 41-6a-804(1)(b).

[55] *Id.* § 41-6a-804(2).

[56] *Id.* § 41-6a-710(1)(a)(i).

[57] *Id.* § 41-6a-710(1)(a)(ii).

[58] *Id.* § 41-6a-1715(1)(b).

[59] *Id.* § 41-6a-1715(1)(a).

1.   The Two-Second Signal

If Mr. Castro failed to signal for a full two seconds before changing lanes into the left-turn lane, then Sgt. Robinson would unquestionably have a valid reason to stop the Castros. The problem is that whether Mr. Castro signaled for two seconds before changing lanes is a disputed material fact. Utah Code Ann. § 41-6a-804(1)(b) provides: "A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last two seconds preceding the beginning of the movement." Violating this two-second rule is an infraction.[60]

Although Sgt. Robinson states that Mr. Castro did not signal for a full two seconds before changing lanes into the left-turn lane,[61] Mr. Castro testified that he did,[62] and the dash camera footage is inconclusive. Indeed, Sgt. Robinson is so far behind the Castros that the dash camera cannot capture whether Mr. Castro's signal lights illuminated prior to or during his lane change. Once Sgt. Robinson maneuvered behind the Castros' vehicle, and the Castros' signal light becomes visible in the video, it is clearly functioning and signaling left. Although one can infer that a two-second signal did not precede an abrupt lane change, inferences must be credited in favor of the Castros.[63] Additionally, even though Sgt. Robinson cited Mr. Castro for failing to signal, prosecutors declined the case.[64] After considering the conflicting testimony between Sgt. Robinson and Mr. Castro and that prosecutors declined the case, a reasonable jury may find in

---

[60] *Id.* § 41-6a-804(5).

[61] ECF No. 108 at 4.

[62] ECF No. 112-2 at 13 of 38.

[63] *Burnette v. Dow Chem. Co.*, 849 F.2d 1269, 1273 (10th Cir. 1988) ("We must view the facts and inferences to be drawn from the record in the light most favorable to the nonmoving party.").

[64] ECF No. 41, ¶ 92; ECF No. 73, ¶ 92.

favor of the Castros as to whether they signaled the requisite two seconds. Therefore, this factual dispute over whether Mr. Castro failed to provide a two-second signal precludes this court from finding at summary judgment that Sgt. Robinson had reasonable suspicion to stop the Castros.

### 2. Signaling a Slowdown to Change Lanes

Sgt. Robinson provides no record support justifying a stop based on Utah Code Ann. § 41-6a-804(2). That statute provides: "A person may not stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal to the operator of any vehicle immediately to the rear when there is opportunity to give a signal."[65] In his declaration, Sgt. Robinson does not rely on the Castros' alleged failure to signal a slowdown as a basis for stopping them. Even so, the dash camera footage fails to show whether the Castros' brake lights came on when they made the lane change from their eastbound travel lane into the left-turn lane, although the illuminated brake lights are clearly visible once Sgt. Robinson's vehicle is close enough for the dash camera to perceive them. Moreover, Mr. Castro was never asked in his deposition whether he slowed down to change lanes or whether his brake lights came on prior to him slowing down to change lanes. There is simply no record evidence supporting Sgt. Robinson's summary judgment assertion that Mr. Castro failed to signal a slowdown prior to his lane change. Therefore, the court cannot rely on this alleged basis to justify the stop.

### 3. Staying in One Lane and Changing Lanes Safely

Utah's lane-change statute does not provide an objective basis for Sgt. Robinson to stop the Castros based on the record before the court on summary judgment. Utah Code Ann. § 41-6a-710(1)(a)(i)-(ii) provides that "a person operating a vehicle: (i) shall keep the vehicle as nearly as

---

[65] Utah Code Ann. § 41-6a-804(2).

practical entirely within a single lane; and (ii) may not move the vehicle from the lane until the operator has reasonably determined the movement can be made safely." As to keeping a vehicle in a single lane, the Court of Appeals for the Tenth Circuit stated:

> [W]hen an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation. The use of the phrase 'as nearly as practicable' in the statute precludes such absolute standards, and requires a fact-specific inquiry to assess whether an officer has probable cause to believe a violation has occurred.[66]

Similarly, other courts interpreting language akin to Utah's lane-change statute have stated that "crossing a solid white line is not a *per se* traffic violation."[67]

Consider *United States v. Gregory*[68] and *United States v. Ozbirn*.[69] In *Gregory*, the Tenth Circuit determined that a traffic stop was unreasonable where a vehicle towing a trailer crossed over into the emergency lane once on winding, mountainous terrain in windy weather while never placing other drivers in danger.[70] Conversely in *Ozbirn*, the Tenth Circuit concluded that a stop was reasonable where a vehicle crossed the fog line twice in a quarter mile in the absence of any road or weather conditions that could have interfered with a driver's ability to keep the vehicle in one lane.[71] But these cases, and many others like them, deal with a driver "drifting" out of a lane—not a deliberate lane change, which is what Mr. Castro did in this case.

---

[66] *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999).

[67] *United States v. Salazar*, No. 1:22-CR-00071, 2022 WL 18141386, at *4 (E.D. Tex. Dec. 12, 2022).

[68] 79 F.3d 973 (10th Cir. 1996).

[69] 189 F.3d 1194.

[70] 79 F.3d at 978.

[71] 189 F.3d at 1198.

Obviously, if a driver intentionally changes lanes, the vehicle will occupy more than one lane for some period of time, albeit briefly. If occupying more than one lane to change lanes violates Utah Code Ann. § 41-6a-710(1)(a)(i), then lane changes are illegal, which is an absurd reading of the statute for which no party advocates. Thus, a deliberate lane change in which a driver leaves one lane to enter another cannot *per se* violate Utah Code Ann. § 41-6a-710(1)(a)(i)'s mandate to keep the vehicle to a single lane.

Nevertheless, a purposeful lane change may violate Utah Code Ann. § 41-6a-710(1)(a)(ii) when a driver fails to "reasonably determine[] [that] the movement can be made safely."[72] The textually unambiguous touchstone of a legal lane change under Utah law is *safety* not style. If the dangerousness of the Castros' lane change was a reason for Sgt. Robinson stopping the Castros, one would expect to find some testimony from Sgt. Robinson on this point. But there is none. And the dashcam video provides no evidence that Mr. Castro's abrupt lane change into the left-turn lane jeopardized anyone's safety. To the contrary, the dash camera footage shows that the only vehicle near the Castros whose safety could have possibly been jeopardized was so far behind the Castros' vehicle that it did not have to apply its brakes when Mr. Castro entered the left-turn lane. The dash camera video shows that Mr. Castro's lane change did not create an unsafe condition for anyone. Thus, no objective evidence shows that Mr. Castro violated Utah Code Ann. § 41-6a-710(1)(a) when he abruptly but safely moved into the left-turn lane.[73]

---

[72] Utah Code Ann. § 41-6a-710(1)(a)(ii).

[73] In addition to the abrupt lane change, Sgt. Robinson's declaration states that the Castros "swerve[d] *within* their lane," ECF No. 108 at 4 (emphasis added), which provided further indicia of potentially impaired driving. Mr. Castro testified that he did not swerve within his lane, ECF No. 112-2 at 34 of 38. The lack of dash camera footage and the contradictory accounts from Sgt. Robinson and Mr. Castro create a disputed issue of material fact on this point.

4.   <u>Distracted Driving and Multiple Traffic Violations</u>

Utah Code Ann. § 41-6a-1715(1)(a) and (b) do not provide an objective basis to stop the

Castros. That statute provides a class C misdemeanor for a driver who:

> (a) commits two or more moving traffic violations under this chapter in a series of acts within a single continuous period of driving covering three miles or less in total distance; or
>
> (b) commits a moving traffic violation under this chapter other than a moving traffic violation under Part 6, Speed Restrictions, while being distracted by one or more activities taking place within the vehicle that are not related to the operation of a motor vehicle, including:
>
>> (i) searching for an item in the vehicle; or
>>
>> (ii) attending to personal hygiene or grooming.[74]

The problem for Sgt. Robinson's assertion of qualified immunity is that there is no

objective basis supported on undisputed facts to find a single traffic violation. This is important

because citing a driver for either multiple traffic offenses or distracted driving requires the driver

to engage in at least one *other* moving violation. As shown above, both the issues of disputed

fact and the lack of record evidence would allow a reasonable jury could find that Sgt. Robinson

lacked an objectively reasonable basis (i.e., reasonable suspicion) that the Castros committed a

traffic violation.[75] Accordingly, the Castros have met their burden to overcome the first prong of

qualified immunity.

---

[74] Utah Code Ann. § 41-6a-1715(1)(a)-(b), (2).

[75] *Works v. Byers*, 128 F.4th 1156, 1163 (10th Cir. 2025) (stating that a plaintiff can satisfy the burden under the first prong of qualified immunity by establishing a constitutional violation "based on facts a reasonable jury could accept as true").

B.  <u>With the Issues of Disputed Material Fact, a Reasonable Jury Could Find a Clearly Established Constitutional Violation</u>.

Considering the totality of the undisputed facts at the summary judgment stage, a reasonable jury could find a clearly established constitutional violation. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[76] Showing unlawfulness "is generally accomplished when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law."[77] The plaintiff generally has the burden of citing to "a controlling case or robust consensus of cases" in which an officer acting "under similar circumstances" was found to have acted unlawfully.[78] "Clearly established law must be particularized to the facts of a case. Thus, while a case need not be directly on point, precedent must still put the underlying question beyond debate."[79] When assessing the "clearly established" prong of qualified immunity, courts are to pay close attention to the specific context of the case and not "define clearly established law at a high level of generality."[80] But "[a] general rule can serve as clearly established law when it states the contours of a constitutional transgression in a well-defined or well-marked manner without leaving a vaguely[ ]defined legal border."[81] Consequently, the question the court must answer is

---

[76] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[77] *Beedle v. Wilson*, 422 F.3d 1059, 1069-70 (10th Cir. 2005) (citation modified).

[78] *D.C. v. Wesby*, 583 U.S. 48, 65 (2018) (citation modified).

[79] *Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018) (citation modified).

[80] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation modified).

[81] *Ashaheed v. Currington*, 7 F.4th 1236, 1246 (10th Cir. 2021) (citation modified).

*not* whether stopping a driver without reasonable suspicion is a clearly established constitutional violation. Rather, the court must determine "whether the circumstances with which [Sgt. Robinson] was confronted" would allow a reasonable officer to find reasonable suspicion that the Castros committed a traffic violation.[82]

As a threshold matter, the court does not consider whether Mr. Castro signaled for the requisite two seconds before changing lanes because it is a disputed issue of material fact that, at this stage, inures to the Castros' benefit. Moreover, Utah's statute governing signaling for lane changes requires an objective two-second standard.[83] That objective standard is significant because it puts both drivers and police officers on clear notice regarding what is and is not a signaling violation. Indeed, the constitutional protections of the Fourth Amendment are rendered nearly meaningless if qualified immunity protects an officer's stop of a driver who signaled for at least two seconds, but the officer made a mistake in counting to two. Successfully counting is something society should reasonably expect an officer to do before using the authority of the state to seize a person. But even assuming that qualified immunity would provide a safe harbor for an officer who loses track of time and stops a driver who signals for three seconds while erroneously believing that the driver signaled for only one, the court cannot make such an assessment here because the dash camera video does not show when and for how long Mr. Castro signaled to turn left. Thus, the duration of Mr. Castro's left-turn signal is null for evaluating qualified immunity's second prong.

---

[82] *Mullenix*, 577 U.S. at 13 (citation modified).

[83] Utah Code Ann. § 41-6a-804(1)(b).

Nevertheless, the undisputed facts show that Mr. Castro crossed a solid white line by abruptly changing lanes.[84] However, the dash camera footage shows that his lane change did not create an unsafe condition for any vehicle, including vehicle B, which was the only one near the Castros but was far enough behind them that it never even tapped its brakes in response to the Castros' abrupt lane change. The dash camera footage is conclusive in this respect because vehicle B was directly in front of Sgt. Robinson such that its brake lights could be seen had they illuminated. They didn't. No other cars, bicycles, or pedestrians were in the vicinity of the Castros' lane change. All of this is significant because safety is the touchstone of legal lane changes in Utah, and the dash camera footage provides no indicia of an unsafe lane change. Indeed, the Tenth Circuit has held that a "properly executed lane change, which the government characterizes as 'abrupt,' . . . fails to provide a basis to reasonably suspect illegal activity."[85] And to the extent Sgt. Robinson relies on the Castros' swerving within their lane prior to the dash camera capturing footage, that too is a disputed issue of material fact that cannot inure to Sgt. Robinson's favor here.

Moreover, there is no evidence showing that the Castros' car failed to illuminate its brake lights when slowing down to change lanes. In fact, in his declaration, Sgt. Robinson does not appear to rely on this basis for stopping the Castros. Likewise, there is no evidence of multiple traffic violations that would form a basis for Sgt. Robinson to stop Mr. Castro for distracted

---

[84] Although Mr. Castro contends that he never crossed the solid white line when entering the left-turn lane, ECF No. 112-2 at 13, 15 of 38, the court finds that this fact is undisputed because the dash camera footage clearly shows that he did. The court may rely on the video footage where, as here, "opposing parties tell two different stories, one of which is blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[85] *United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir. 1993).

driving or for multiple offenses in a three-mile segment of continuous driving. Tellingly, Sgt. Robinson does not rely on this latter reason either for stopping the Castros.

Sgt. Robinson claims, however, that his decision to stop the Castros was based, in part, on information he received from Deputy Lowe. But Deputy Lowe's observations do not help Sgt. Robinson here. The things that Deputy Lowe reported to Sgt. Robinson about the Castros had nothing to do with traffic offenses. To the contrary, Deputy Lowe was clearly concerned that the Castros were involved in illegal conduct other than traffic offenses. The constitutional requirement than an officer have "some minimal level of objective justification for making the stop"[86] neither becomes more "minimal" nor less "objective" because another law enforcement officer provides information irrelevant the purported reason for the stop. Thus, Deputy Lowe provides no facts that would help supply reasonable suspicion that the Castros were violating traffic laws, which is the *only* basis for which Sgt. Robinson stopped them. Accordingly, under the specific facts of this case, a reasonable officer would know that a lane change like the Castros' did not justify a Fourth Amendment stop.

Given the disputed facts and the lack of an otherwise valid, objective basis to stop the Castros based on undisputed facts, a reasonable jury could find that Sgt. Robinson violated a clearly established constitutional right.[87] Accordingly, Sgt. Robinson is not entitled to qualified immunity at this summary judgment stage on the Castros' remaining § 1983 claim.

---

[86] *Winder*, 557 F.3d at 1134 (citation modified).

[87] The court emphasizes that this determination is limited to summary judgment because the facts that the jury will resolve at trial will be essential to determining whether there was an underlying traffic violation that justified Sgt. Robinson's stop of the Castros. "Where such factual disputes are present, the district court can submit special interrogatories to the jury to establish the facts[,]

## II.    Sgt. Robinson is Entitled to Summary Judgment on the Castros' Claim Under Article I, § 14 of the Utah Constitution Because § 1983 Provides Relief.

Because § 1983 may provide relief to the Castros, Sgt. Robinson is entitled to summary judgment on their remaining Utah Constitution claim. To prove a claim under Article I, § 14, of the Utah Constitution, "a plaintiff must establish the following three elements before he or she may proceed with a private suit for damages."[88] "First, a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights."[89] "Second, a plaintiff must establish that existing remedies do not redress his or her injuries."[90] "Third, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[91]

Because the Castros' § 1983 action is proceeding to trial, they cannot establish the second *Spackman* requirement. "At the motion to dismiss stage, courts allow both claims to proceed because it would be premature to determine which claim might be meritorious. This is because a court at the motion to dismiss stage has limited information about any overlap between a plaintiff's state and federal claims."[92] However, at summary judgment, "courts regularly conclude that if the § 1983 claim is viable, the state constitution claim should be dismissed

---

and based on the jury's findings, the district court can then determine whether the defendant's conduct was lawful in light of the clearly established law." *Lundstrom v. Romero*, 616 F.3d 1108, 1119 (10th Cir. 2010) (citation modified).

[88] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 16 P.3d 533, 538 (Utah 2000).

[89] *Id.*

[90] *Id.*

[91] *Id.* at 539.

[92] *Finlinson v. Millard Cnty.*, 455 F. Supp. 3d 1232, 1244 (D. Utah 2020) (citation modified).

because the plaintiff's injuries can be fully redressed through their 42 U.S.C. § 1983 claim."[93] The Castros' injuries are the focal point of whether the Castros' Utah constitutional claim should be dismissed for providing a duplicative remedy to § 1983 claim. The court cannot find—and the parties have not identified—any remedy to the Castros' alleged injuries under the Utah Constitution that is not already available under § 1983. Therefore, the Castros cannot meet the second element under *Spackman*, which entitles Sgt. Robinson to summary judgment.

## ORDER

Sgt. Robinson's motion for summary judgment[94] is GRANTED IN PART AND DENIED IN PART. The court GRANTS Sgt. Robinson's motion as to the Castros' claim under Article I, § 14 of the Utah Constitution. The court DENIES Sgt. Robinson's motion as to the Castros' § 1983 claim because disputed issues of material fact exists as to his assertion of qualified immunity that can be resolved only at trial.[95]

---

[93] *Id.* (citation modified).

[94] ECF No. 107.

[95] In response to Sgt. Robinson's statement of facts, the Castros' counsel provides many invalid objections. Fed. R. Civ. P. 56 provides counsel with three—and only three—options for contesting a moving party's factual statements in a motion for summary judgment. First, the Castros can assert that a fact "is genuinely disputed" by "citing to particular parts of materials in the record" or by "showing that the materials [the moving party cites] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B). Second, the Castros can "object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Finally, the Castros can assert that they are unable to "present facts essential to justify [their] opposition," and may request relief from the court. Fed. R. Civ. P. 56(d). Because the Castros have not asserted the third option, they are limited to the first two. As to the first option, the Castros drop the ball. They respond to many of Sgt. Robinson's facts as "disputed" but fail to provide any citation to any record evidence showing a dispute. *See, e.g.*, ECF No. 112 at 9, 11. Although they cite evidence in support of their disputed facts in the body of their opposition memorandum, such citations are missing from their response to Sgt. Robinson's statement of facts. This is improper. Unfortunately for the

IT IS SO ORDERED.

DATED this 18th day of March 2026.

BY THE COURT:

_____
JARED C. BENNETT
United States Magistrate Judge

---

court, the Castros' performance under Rule 56's second option (i.e., admissibility of evidence) is just as bad. Instead of relying on the Federal Rules of Evidence to show that Sgt. Robinson's facts are inadmissible, many of the Castros' objections are based on "characterization," "inference," and "framing." *See, e.g.*, *id*. at 6-7, 12. The Federal Rules of Evidence do not countenance such objections. The one objection the Castros repeatedly make that has at least a plausible basis under the Federal Rules of Evidence, however, is regarding opinion testimony. *Id*. at 4, 6, 7, 9-11. Even here, the Castros leave the court hanging by simply stating an objection for "improper opinion" without any citation to a Federal Rule of Evidence. The court presumes that the Castros' intend to argue that Deputy Lowe and Sgt. Robinson provided improper lay opinion testimony under Fed. R. Evid. 701 and 702. But after reviewing each of these bare objections, the court sees no basis for excluding the observations of Deputy Lowe or Sgt. Robinson because they testify to facts that are well within their ability to perceive as lay witnesses, and they do not offer any observations that require expert designation under Fed. R. Evid. 702. Therefore, the Castros' evidentiary objections are all overruled.